UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| WESLEY M. JESTER, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. No. 2:11-cv-339 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Wesley M. Jester, III brought this action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him supplemental security income ("SSI") and disability insurance benefits ("DIB"). The Commissioner has filed a motion for summary judgment [Doc. 15].

For the reasons stated below, I **RECOMMEND** (1) the Commissioner's motion for summary judgment [Doc. 15] be **GRANTED**; and (2) the decision of the Commissioner be **AFFIRMED**.

**I.    ADMINISTRATIVE PROCEEDINGS**

Plaintiff initially filed his application for SSI and DIB on September 1, 2009, alleging disability as of October 1, 2008 (Transcript ("Tr.") 124-32). Plaintiff's claim was denied initially and upon reconsideration and he requested a hearing before the ALJ (Tr. 55, 58-81). The ALJ held a hearing on May 19, 2011, during which Plaintiff was represented by an attorney (Tr. 26-45). The ALJ issued a decision on May 24, 2011 and determined Plaintiff was not

disabled because there were jobs he could perform in the national economy (Tr. 7-20). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-3). Plaintiff, filing his complaint *pro se*, timely sought judicial review of the Commissioner's final decision [Doc. 2].

## II. FACTUAL BACKGROUND

### A. Education and Background

Plaintiff was 37 years old, a younger individual, at the time of the hearing and the ALJ's decision (Tr. 42). Plaintiff had received his GED and had also received a Microsoft certification after taking the test twice after one month into a six month program (Tr. 39-40). Plaintiff testified he had worked primarily as a welder fabricator, which involved working with steel, iron, labor tools, and heavy equipment (Tr. 30). As a welder, he had to lift iron, which weighed more than 50 pounds (Tr. 30). Plaintiff had also worked as a tow truck driver, doing vehicle repossessions and contracting with AAA (Tr. 30). That work entailed picking up cars, running chains around the vehicles and flipping them up, with a lot of bending and stooping (Tr. 30). Plaintiff had also worked for Dell doing on-site computer repair for about five months (Tr. 31, 40). Plaintiff had repaired cell phone towers many years ago, which involved heavy lifting and climbing 400-500 feet (Tr. 40-41).

Plaintiff testified he could not work due to a variety of health issues, but the primary problem was coronary artery disease and acute coronary syndrome ("ACS") due to his heart attacks (Tr. 31). Plaintiff reported having heart attacks in 2005 and testified that his heart symptoms made it difficult to work because he had minor heart attacks every couple of weeks, difficulty breathing, and chest pains with any physical exertion (Tr. 31-32). Plaintiff took nitroglycerin to relieve his daily chest pains about once a week, but the medication caused severe

2

Case 2:11-cv-00339-HSM-SKL   Document 17   Filed 10/15/12   Page 2 of 20   PageID #: 67

headaches that would last for hours (Tr. 32-33). Plaintiff also had a ripped bicep tendon in his left arm that limited his ability to use that arm for grabbing, pulling and lifting (Tr. 33). Plaintiff was right handed, but did most things with his left hand and arm (Tr. 33). Plaintiff testified to hip problems on his left side and back problems, but was unable to get treatment because he did not have health insurance (Tr. 34).

As to mental impairments, Plaintiff testified that he was bipolar and manic depressive and had severe anxiety, which resulted in daily anxiety attacks; he tried to stay at home and was intimidated even when walking outside (Tr. 34-35). Plaintiff testified to crying for no reason and further stated he had Attention Deficit Hyperactivity Disorder ("ADHD") and had never been able to focus on anything for more than five or ten minutes (Tr. 35). Plaintiff had attempted to return to school, but would eventually become unable to focus (Tr. 36-37). Plaintiff lived with his fiancé and was able to cook, although he sometimes got distracted due to the ADHD and burned food (Tr. 38-39). Plaintiff was generally too nervous to drive, so he would let his fiancé drive (Tr. 35-36).

Plaintiff testified that, in addition to these problems, he had a sleep disorder and sometimes would not sleep for days at a time (Tr. 36). Plaintiff was receiving some mental health treatment from Watauga Behavioral Health and was taking Lamictal for manic depression and Seroquel for the sleep disorder (Tr. 35-36). The Lamictal helped with his mood, but not his depression; although the Seroquel sometimes allowed him to sleep, he stated he has never had a peaceful night's sleep (Tr. 35-36). As to side effects, Seroquel caused restless leg syndrome and Plaintiff's legs and arms would flail out at times; the Lamictal caused intestinal problems, and Plaintiff was light headed and dizzy for 20-30 minutes after using an inhaler for chronic pulmonary obstructive disease ("COPD") (Tr. 37).

3

Plaintiff testified to smoking two packs a day before his heart attack (Tr. 38). Plaintiff had stopped for a while, but because of recent stress and his medications running out, Plaintiff testified he was smoking about half a pack a day (Tr. 38).

**B. Vocational Expert Testimony**

The ALJ sought the testimony of vocational expert ("VE") Bentley Hankins at the hearing. First, the ALJ asked the VE to describe Plaintiff's past work (Tr. 41). The ALJ next asked the VE if there would be jobs available for a 37 year old individual with a GED and a Microsoft certification who could only perform light work consisting of simple, routine job tasks and could not be exposed to excessive dust, fumes, chemicals and temperature extremes (Tr. 42). The VE testified that such an individual could work as a parking lot attendant, cashier, machine feeder and off bearer, hand packer and packager, or mail clerk (Tr. 42). There were approximately 2.3 to 2.35 million of these positions in the national economy, and 50,000 to 52,000 regionally (Tr. 42-43). The VE testified that if the individual's ability to concentrate and persist at a task was greater than moderately impaired due to pain or emotional nerve problems as described in Plaintiff's testimony, the hypothetical individual would be unable to perform these jobs (Tr. 43).

Plaintiff's counsel sought testimony from the VE with respect that all the jobs indicated in his response to the ALJ's hypothetical question would require the use of both hands (Tr. 43). The VE testified that if the hypothetical included a restriction that the individual could not use his left arm more than occasionally, there would be only 170,000 such jobs available nationally and 3,000 to 3,500 regionally (Tr. 43-44).

4

### C. Medical Records[1]

Plaintiff presented at the emergency room at Florida Hospital/East Orlando on May 17, 2005, complaining of dizziness and severe chest pain that radiated to his jaw and lasted for 20 minutes (Tr. 176-77). Plaintiff was transferred to Florida Hospital South for evaluation and underwent a SPECT imaging stress test the following day; notes indicate the physicians would continue to rule out myocardial infarction (Tr. 174-80). Plaintiff presented to Orlando Regional on May 4, 2006 complaining of chest pain on his left side which was radiating to his left shoulder, arm, and jaw (Tr. 186-92). Plaintiff's ECG showed normal sinus rhythm and the physician ruled out ACS, noting Plaintiff had a history of percutaneous transluminal coronary angioplasty ("PTCA") (Tr. 192). Scans of Plaintiff's chest showed no acute cardiopulmonary abnormality (Tr. 193).

Plaintiff started seeing a family physician in Florida on May 22, 2006, and reported anxiety, problems sleeping, and diagnoses of ADHD and bipolar disorder (Tr. 218). Plaintiff stated he was experiencing increased depression and reported his recent hospital visits (Tr. 218). Plaintiff received a psychiatry referral and on May 30, 2006, Plaintiff was evaluated at Tri-County Psychiatric Associates in Orlando (Tr. 211, 218). Plaintiff reported mood swings where he would vacillate between having lots of energy and making rash decisions and having no motivation and sleeping all the time (Tr. 211). Plaintiff was diagnosed with bipolar disorder-depressed and started on Depakote; his Global Assessment of Functioning ("GAF") score was 50-55[2] (Tr. 212). During a follow up appointment on June 6, 2006, Plaintiff stated that he had

---

[1] Much of the evidence in the record consists of records prior to October 1, 2008, the alleged onset date. Those records are summarized here primarily for background.

[2] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

5

not noticed any improvement with medication and reported continued problems falling asleep; the Depakote dosage was increased and Plaintiff was prescribed Temazepam (Tr. 213). Plaintiff also had a follow up with his family physician to obtain lab results and again complained of insomnia and anxiety; he asked for medication to help him sleep (Tr. 217).

On July 18, 2006, Dr. Theodore Weber filled out Mental Residual Functional Capacity Assessment and Psychiatric Review Technique forms (Tr. 224-41). Dr. Weber opined Plaintiff was moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions form psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently of others (Tr. 225-26). Dr. Weber opined that Plaintiff could complete simple tasks on a regular basis and could cooperate and be socially appropriate, but would have difficulties accepting criticism from supervisors (Tr. 226). Dr. Weber further opined Plaintiff was mildly limited in activities of daily living and moderately limited in maintaining social functioning and concentration, persistence and pace (Tr. 238). As support for the first two opinions, Dr. Weber noted that Plaintiff was able to care for his personal hygiene, make simple meals, do laundry, drive, shop, and manage money and he socialized with family and could get along with others (Tr. 240). As for concentration, persistence, and pace, Dr. Weber noted Plaintiff needed reminders for medications and appointments, had problems paying attention and complying with written instructions without re-reading them, and had daily anxiety attacks (Tr. 240).

On October 2, 2006, Dr. Violet Stone filled out a Physical Residual Functional Capacity Assessment form (Tr. 242-49). Dr. Stone opined Plaintiff could occasionally lift and/or carry 50

6

pounds and could frequently lift and/or carry 25 pounds, could stand and/or walk for a total of about six hours in an eight-hour workday, could sit for a total of about six hours in an eight-hour workday, and was unlimited in his ability to push and/or pull (Tr. 243). Dr. Stone opined Plaintiff was further limited in that he should avoid concentrated exposure to extreme temperature and hazards (Tr. 246). Dr. Stone noted Plaintiff's cardiac workup was negative and that he might have mild COPD due to cigarette use (Tr. 247).

Plaintiff followed with the Washington County Health Department ("Health Department") starting in June 2008 and complained of problems breathing and sleeping; several labs were performed and Plaintiff was advised to stop smoking and lose weight (Tr. 412-16). Plaintiff continued to have appointments at the Health Department for medication refills, lab results, and minor complaints throughout 2008 and 2009 (Tr. 289-99, 399-411).

Plaintiff was referred to Watauga Behavioral Health ("WBH") by the Washington County Health Department in September 2008 and had his first session on September 19, 2008 (Tr. 268-70). Plaintiff reported having suicidal thoughts, no stability with employment, poor sleep, irritability, feelings of hopelessness, and impulsive behavior all the time (Tr. 268). Plaintiff was diagnosed with bipolar disorder and post-traumatic stress and his GAF was 50 (Tr. 269). Plaintiff did not show up for his next appointment and did not return until July 22, 2009 (Tr. 265-67). At that time, Plaintiff reported difficulty with mood swings and said he was unable to work with anyone because he would end up killing somebody; he also reported racing thoughts, depression, and suicidal thoughts all the time (Tr. 265). Plaintiff's GAF was 60 (Tr. 265). On August 14, 2009, Plaintiff reported to the Johnson City Medical Center after the Health Department observed that his blood pressure was up (Tr. 254-61).

7

Plaintiff returned to WBH on September 15, 2009 for a medication follow up and reported sleeping 16 hours a day and still having problems with irritability; he had a visit at the Health Department on September 17 for medication refills (Tr. 264, 287-88, 360). Plaintiff presented to the Health Department on October 14, 2009 complaining of a headache and his blood pressure was high (Tr. 285-86). Plaintiff submitted to a psychological evaluation with Dr. Steven Lawhon on November 18, 2009 (Tr. 301-04). Plaintiff reported his physical problems included past heart attacks, hypertension, COPD, and possible back injury following a car accident (Tr. 301-02). Plaintiff also reported a diagnosis of bipolar disorder and a past suicide attempt; he appeared depressed during the evaluation and reported mood swings and occasional suicidal thoughts (Tr. 301-02). Dr. Lawhon opined the evaluation provided support for bipolar disorder because Plaintiff reported episodes of depression and mania and had had past psychiatric hospitalizations (Tr. 302). Dr. Lawhon further opined Plaintiff was functioning in the average intellectual range (Tr. 303). Dr. Lawhon diagnosed Plaintiff with bipolar disorder, mixed type, and assigned him a present GAF score of 55 and noted a past GAF of 75 (Tr. 303). Dr. Lawhon opined Plaintiff's ability to understand and remember was mildly limited and his abilities to sustain concentration and persistence and adapt to work were moderately limited; Plaintiff was not significantly limited in social interaction (Tr. 304). Dr. Lawhon noted that Seroquel may be affecting Plaintiff's abilities and recommended a medication review (Tr. 304).

Plaintiff returned for an appointment at WBH on November 25, 2009 and reported Seroquel was helping him sleep but had caused him to gain weight (Tr. 359). Lamictal was started (Tr. 359). On December 22, 2009, Plaintiff reported Lamictal was not helping, and Seroquel was not helping him sleep (Tr. 358).

8

Dr. Krish Purswani conducted a physical examination of Plaintiff on December 16, 2009 (Tr. 306-09). Plaintiff reported having shortness of breath upon walking for short distances and a diagnosis of COPD, chest pain about once a week for up to 15 minutes, at either rest or during exertion, low back pain for 10 years that occasionally radiated to both legs in addition to upper back pain while coughing and right hip pain, and bipolar disorder (Tr. 306). Dr. Purswani noted Plaintiff's past diagnoses of hypertension and COPD and observed Plaintiff had a normal gait and station with normal effort and his range of motion in limbs was generally normal (Tr. 307-08). Dr. Purswani assessed Plaintiff has having shortness of breath, COPD, chest pain without diagnosis, history of coronary artery disease, post PTCA, low back pain, bipolar disorder, morbid obesity, hypertension, and tobacco abuse (Tr. 309). Dr. Purswani opined that, considering Plaintiff's shortness of breath and chest and low back pain, Plaintiff could frequently lift up to 40 pounds from the floor in an eight-hour workday, could stand for seven hours and walk for seven hours, for a total of seven hours in an eight-hour workday, and could sit for eight hours in an eight-hour workday (Tr. 309). Dr. Purswani filled out a more detailed form to this effect on the same day (Tr. 310-15).

On January 8, 2010, Dr. John Netterville filled out a Physical Residual Functional Capacity Assessment form (Tr. 324-32). Dr. Netterville opined Plaintiff could occasionally lift and/or carry up to 50 pounds and could occasionally lift and/or carry up to 25 pounds, could stand and/or walk for about six hours in an eight-hour workday and sit for six hours in an eight-hour workday, and was unlimited in his ability to push and/or pull (Tr. 325). Dr. Netterville opined Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, or poor ventilation, but did not assess any other environmental limitations (Tr. 328). Dr. Netterville noted Plaintiff was partially credible because no physical difficulties were observed during

examination besides coughing, which would not be abnormal for an obese smoker (Tr. 331). Dr. Netterville further noted no documentation of a back impairment or cardiac impairment (Tr. 331).

Dr. Cynthia Jackson filled out a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment form on January 11, 2010 (Tr. 333-49). Dr. Jackson opined Plaintiff had moderate limitations in maintaining concentration, persistence and pace and mild limitations in activities of daily living and social functioning based on his psychological evaluation and complaints, which were considered credible (Tr. 343, 345). Dr. Jackson further opined Plaintiff was moderately limited in his ability to perform activities within a schedule, maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from psychological symptoms, and respond appropriately to changes in the work setting (Tr. 347-48). Dr. Jackson noted Plaintiff could understand simple and some detailed tasks, but could not make independent decisions at an executive level; could concentrate for a two hour period in an eight-hour workday; could interact appropriately with the public, co-workers and supervisors; and could adapt to infrequent change and set limited goals (Tr. 349).

During Plaintiff's appointment at WBH on January 26, 2010, Plaintiff reported improvement because he had a new girlfriend, but reported continued problems with concentration and asked about medication for that problem; Strattera was started (Tr. 356). After missing an appointment on March 9, 2010, Plaintiff appeared for his appointment on April 14, 2010 and reported the Strattera hurt his stomach and he could not wake up in the morning on the Seroquel dosage (Tr. 354-55). Wellbutrin was added (Tr. 354). During appointments in May and July 2010, Plaintiff reported doing better, stating only that he still felt somewhat down and had low energy at times, but his mood swings, sleeping, and irritability were improved (Tr. 352-

10

53). On August 10, 2010, Dr. J. Nuri Yong wrote a letter stating that Plaintiff had been under the care of WBH since May 30, 2006, had been diagnosed with bipolar disorder and was on medication to treat the condition (Tr. 361). Dr. Yong stated that Plaintiff "needs to continue to remain off work until he is stable" and would be evaluated every three to six months (Tr. 361).

Plaintiff returned to WBH on August 25, 2010 and reported having sleep difficulties (Tr. 372). Lamictal was helping with his irritability, but Wellbutrin was making him anxious and he was having concentration problems that affected his ability to study (Tr. 372). On September 10, 2010, Plaintiff reported to the Health Department for the first time since late 2009 and complained that he could not walk into a store without stopping to breathe, had to stop to breath after taking one flight of stairs and sit down after two, and was experiencing chest pain; he was referred to Johnson City Medical Center and was hospitalized (Tr. 697-98). Scans of Plaintiff's chest on September 10 showed normal left ventricular systolic function and mild to moderate anterior, anterior apical wall reversible ischemia (Tr. 364-65). Plaintiff returned to the Health Department on September 16, 2010 for a follow up visit and on October 1, 2010 to refill his medication; during the latter visit, he reported he had stopped smoking (Tr. 393-95). Plaintiff presented at the Health Department on October 12, 2010 and reported pain in his left arm; he returned on October 14 and had an MRI, and returned on October 28, 2010 for review of the results (Tr. 366-68, 386-92). Plaintiff was diagnosed with a sebaceous cyst and a bicep tendon tear and received an orthopedic referral (Tr. 386-87).

Plaintiff was seen by someone new at WBH during a visit on January 7, 2011 and reported not doing well; he stated he was experiencing increased depression, insomnia, and difficulty concentrating (Tr. 370). Plaintiff stated Seroquel was not as effective as it had been and was making him feel "drugged" at a higher dose (Tr. 370). Plaintiff's medications were

11

changed (Tr. 370-71). Plaintiff returned to the Health Department January 11, 2011 for medication refills and reported he had quit smoking (Tr. 384-85). Plaintiff was still not smoking during a visit on March 10, 2011 (Tr. 382-83).

## III. ELIGIBILITY AND THE ALJ'S FINDINGS

### A. Eligibility

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B. The ALJ's Findings

At step one of the process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since October 1, 2008, the alleged onset date (Tr. 12). At step two, the ALJ

found Plaintiff had the following "severe impairments": atypical chest pain; chronic obstructive pulmonary disease; obesity; bipolar disorder; posttraumatic stress and a history of polysubstance abuse (Tr. 12). The ALJ noted these impairments could result in some limitations regarding exertional and non-exertional activities and were therefore considered to be "severe" (Tr. 12). The ALJ considered Plaintiff's hypertension and left shoulder pain, but determined these impairments were not severe because the hypertension was well controlled by medication and there was no indication the left shoulder pain caused significant functional limitations for 12 or more months continuously (Tr. 13). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 13). Specifically, the ALJ considered Listings 4.00, 3.00, 12.04, 12.08, 12.09 and other listings under 12.00 (Tr. 13). The ALJ determined the Plaintiff had the residual functional capacity ("RFC") to perform light work which involved simple, routine job tasks and did not require him to be exposed to excessive dust, fumes, chemicals, or temperature extremes (Tr. 14). At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work (Tr. 18). At step five, the ALJ noted that Plaintiff was a younger individual, 18-49, had at least a high school education and was able to communicate in English (Tr. 18). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 19). This finding led to the ALJ's determination that Plaintiff has not been under a disability as of October 1, 2008 (Tr. 19).

## IV. ANALYSIS

Plaintiff, who was represented by counsel during the hearing before the ALJ but proceeded *pro se* in this appeal, did not file a motion or brief in support of his appeal as required

by the Court's scheduling order [Doc. 11]. The Commissioner asserts generally that the ALJ's decision was supported by substantial evidence and specifically argues in favor of affirming the ALJ's RFC and credibility determinations.

### A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of

14

substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B. The ALJ's Decision

The Commissioner argues that the ALJ's determination that Plaintiff had the RFC to perform light work was supported by substantial evidence [Doc. 16 at PageID # 57-60]. In support of this argument, the Commissioner notes, among other things, that Plaintiff's heavy smoking habit never caused him to be hospitalized for breathing problems, his smoking continued despite COPD and doctors' recommendations to quit, Plaintiff did not stop his last job due to an inability to perform the physical work but because he was laid off, his physical exam findings were normal despite obesity, Plaintiff stated to his mental health provider that he was looking for work shortly before his disability onset date, and Plaintiff's activities of daily living and social interactions were generally normal [Doc. 16 at PageID # 58-59]. The Commissioner acknowledges Dr. Nuri Yong's opinion that Plaintiff needed to remain off work until he was stable, but argues that the ALJ correctly determined that this statement was not a medical opinion and was an opinion on an issue reserved to the Commissioner [*id.* at PageID # 60]. Furthermore, the Commissioner contends the statement was unsupported by the evidence in the record [*id.*]. The Commissioner further argues the ALJ's credibility determination was supported by

15

substantial evidence because Plaintiff never received aggressive treatment, could sit, stand and walk satisfactorily, engaged in a number of activities both physically and socially, and did not make lifestyle changes to improve his health such as quitting smoking [*id.* at PageID # 62-63].

The ALJ based his RFC determination on the physical and mental evidence in the record with an attention to records after October 1, 2008, Plaintiff's alleged disability onset date. The ALJ noted there was no indication that Plaintiff was experiencing debilitating chest pain that would preclude work activity because, although Plaintiff was hospitalized in 2005 and 2006, his recent physical examination was normal, and testing when he was hospitalized in 2010 was generally normal (Tr. 15). The ALJ further noted that Plaintiff was never hospitalized for COPD and the condition appeared to impose only mild restrictions on Plaintiff's ability to function; the ALJ also observed that these problems could improve if Plaintiff stopped smoking (Tr. 15). The ALJ considered Plaintiff's obesity in conjunction with his other physical complaints (Tr. 16).

As for Plaintiff's bipolar disorder, the ALJ noted that Plaintiff's mental health records did not indicate any severe mental problems, as Plaintiff did not seek treatment for a period of nine months and was alert, oriented, and coherent during his sessions (Tr. 16). Moreover, the ALJ concluded Dr. Yong's letter was inconsistent with the evidence in the record and the examination by Dr. Lawhon, and found that Dr. Yong's opinion that Plaintiff could not work was an issue reserved to the Commissioner (Tr. 16-17).

The ALJ noted that in the absence of aggressive physical treatment, he gave Plaintiff the benefit of the doubt in restricting him to light work with no exposure to temperature extremes; as for mental restrictions, the ALJ imposed restrictions consistent with Dr. Lawhon's opinion (Tr. 15-17). The ALJ determined Plaintiff's complaints were not entirely credible because he was able to sit, stand and walk satisfactorily; there was no evidence in the record that Plaintiff

16

required hospitalization due to pain; no treating physician had ever opined Plaintiff could not work; Plaintiff had never been hospitalized for mental issues; and Plaintiff testified to a variety of daily activities (Tr. 17). After determining Plaintiff's RFC, the ALJ sought testimony from the VE to determine if an individual with Plaintiff's RFC could perform jobs in the national economy. The VE indicated that an individual restricted to light work involving simple, routine job tasks that did not require exposure to excessive dust, fumes, chemicals, or temperature extremes could work as a parking lot attendant, cashier, counter or rental clerk, machine feeder and off bearer, hand packer and packager, or mail clerk (Tr. 19). There were 50,000 to 52,000 of these jobs regionally and 2.3 to 2.35 million nationally (Tr. 19). As such, the ALJ concluded Plaintiff was not disabled because there were jobs in significant numbers in the national economy which Plaintiff could perform.

Essentially, the only opinion in the record that states Plaintiff is disabled and cannot work is the letter from Dr. Yong. As a preliminary matter, the statement that Plaintiff was treated by Dr. Yong since May 30, 2006 is simply inaccurate, as Plaintiff was still living in Florida at that time and had begun mental health treatment with providers in Florida; in fact, it appears Plaintiff saw Dr. Yong for the first time in July 2009 (Tr. 211-13, 265-66). In addition, the ALJ was correct in stating that an opinion that an individual cannot work is not a medical opinion entitled to any weight and is instead an issue reserved to the Commissioner. "When a treating physician . . . submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is 'disabled' or 'unable to work'—the opinion is not entitled to any particular weight." *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 493 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527(d)(1)-(2) ("Opinions on some issues, such as the examples that follow, are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are

administrative findings that are dispositive of a case . . ."). Moreover, in the year Plaintiff received treatment from Dr. Yong (from July 2009 to August 2010, the date of the letter), Plaintiff's symptoms were improving on medication and the session notes generally consist of complaints about various medication dosages and Plaintiff had his medication adjusted as necessary. Accordingly, I **FIND** the ALJ's treatment of Dr. Yong's opinion was proper and was supported by substantial evidence.

As for Plaintiff's physical complaints, the evidence in the record after October 1, 2008 supports the ALJ's RFC determination. Plaintiff sought treatment from the Health Department for mostly minor complaints and medical refills to control hypertension; although he was hospitalized once for chest pain, his test results were generally normal and this incident followed a gap of nine months in his treatment for any physical complaints; and he was often encouraged to stop smoking and lose weight to improve his health. There were no significant physical problems which were continuously evident in Plaintiff besides hypertension, and the limitations imposed by the physical examiner and consultative examiner were similar and consistent with the medical evidence in the record. I **FIND** the ALJ's RFC determination that Plaintiff was limited to light work with no exposure to excessive dust, fumes, chemicals and temperature extremes was supported by substantial evidence.

Additionally, although Plaintiff testified to having significant physical and mental symptoms, the ALJ reasonably determined the evidence in the record was inconsistent with his hearing testimony and subjective complaints of disabling symptoms. Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (ALJ's credibility assessment is entitled to substantial deference). I **FIND** the ALJ's determination that Plaintiff's subjective complaints were not entirely credible was supported by substantial evidence.

After reviewing the medical records and the ALJ's decision, I **CONCLUDE** the ALJ's RFC and credibility determinations are supported by substantial evidence. I **FIND** the ALJ reasonably relied upon VE testimony to find that jobs existed in significant numbers in the national economy which Plaintiff could perform, and I further **CONCLUDE** the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence.

## V. CONCLUSION

Having carefully reviewed the administrative record and the Commissioner's arguments, I **RECOMMEND**[3] that:

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

1) The Commissioner's motion for summary judgment [Doc. 15] be **GRANTED.**

2) The Commissioner's decision denying benefits be **AFFIRMED.**

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE